Webb vs. Drake et als.

No. 13,191.

T. T. WEBB VS. F. H. DRAKE ET ALS.

SYLLABUS.

1. When it appears that several persons have similar, or identical, grounds of complaint, and entertain like feelings of resentment, against another, and when, for the gratification of such feelings, they by their acts and utterances, endeavor to destroy his business, each being aware of the feelings and doings of the other and approving the results accomplished, there is sufficient evidence of a combination, or common purpose, and such persons are properly joined as defendants in an action in damages, and are liable *in solido* for punitory and exemplary, as well as actual, damages.
2. When it becomes currently reported that a boycott has been established by the merchants of a town against a hotel, and that they will not buy from drummers who patronize such hotel, and such report is the natural consequence of the acts and utterances of the defendants, in an action in damages brought by the hotel keeper, the existence of the report may be proved.

APPEAL from the Second Judicial District Court for the Parish of Webster. *Watkins, J.*

*Stewart & Stewart* and *C. E. McDonald* for Plaintiff and Appellant.

*L. K. Watkins, R. C. Drew, J. N. Sandlin* for Defendants, Appellees.

The opinion of the court was delivered by

MONROE, J. Plaintiff alleges, in substance, that he has been conducting a hotel, in the town of Minden, known as the "Webb House," which property was purchased in the name of his wife and paid for, in part, with her paraphernal funds, and in part, with community funds, and that he has expended a large amount of money in fitting and furnishing the same. That his wife has devoted her time and attention to the management of the business, and that the hotel was regarded as one of the best in North Louisiana, and received the entire patronage of the traveling public and especially of "drummers," who patronized it in preference to any other hotel.

That he incurred the ill-will of Thomas Crichton, James E. Crichton and Felix H. Drake, prominent merchants in Minden, and of Robert H. Miller, cashier of a bank, and that they, individually and

collectively, illegally, wantonly and maliciously determined to destroy his hotel business, to ruin him financially, and to disparage him in public esteem; and, that they proceeded to carry said determination into effect, by giving it to be understood that they would buy no goods from drummers who stopped at his hotel, and by dissuading drummers from patronizing him, which action, on their part, was made public in Minden, on the railroads, and throughout North Louisiana, with the result, that drummers who had been his patrons ceased to stop at his hotel; and, within a few days after said first named defendants were indicted, upon information furnished by him, he was obliged to close his hotel for lack of patronage. He alleges that he has sustained, and he claims, as damages, $10,000 for destruction of business, $10,000 for humiliation of himself and wife, and $10,000 as punitory damages.

The defendants excepted on the grounds:

1. That the petition discloses no cause of action.

2. That there is a misjoinder of defendants.

3. That it appears from the petition, that the business was that of the wife, and the plaintiff is without interest to bring this suit in his own name.

These exceptions having been overruled, the defendants filed a general denial.

The exceptions, we think, were properly overruled.

Plaintiff alleges that he and his wife have been injured through the malicious conduct of defendants; he charges them with the commission of torts, with the common purpose of inflicting injury upon him; and, whilst he alleges that the hotel was partly paid for with the paraphernal funds of his wife, and partly with the funds of the community, and that his wife had the special superintendence of the business, he also alleges that he was conducting the hotel, so that it does not appear to be a case where the wife was separate in property, or where she was administering her paraphernal property separately and alone. Cooper vs. Cappel, 30 Ann., 213.

The evidence shows that the plaintiff had been for several years the assessor for the parish of Webster, and that, partly by reason of matters arising from his administration of his office, and partly for other reasons, an unfriendly feeling existed between him and the defendants, Miller, Thomas Crichton and Drayton. In February, 1898, he had the defendants Drake and Thomas Crichton indicted for fail-

ure, as presidents of certain business corporations, to make returns for the purposes of assessments, and this action fanned their resentment into a blaze and led to utterances and action on their part tending to break down Webb's hotel business.

Crichton, as the evidence shows, called upon Goodwill, another prominent merchant, who had been similarly indicted, and stated that he did not intend to purchase goods from any drummers who stopped at Webb's Hotel, with an implied invitation, or suggestion, that Goodwill should pursue the same course. This suggestion not being favorably received by Goodwill, the matter dropped, so far as he was concerned. That further action was taken by Crichton, and also by Drake and Miller, there can, however, be no doubt. Crichton admits the conversation with Goodwill, but says that, after that, he did nothing. He does not say, that he had done nothing before, and we think his own testimony shows that he is mistaken in saying that he did nothing afterwards. Thus, the following appears in the report of his testimony:

"Q. You did not do anything then at all?

"A. No, sir. It was just my friends that I met in the streets and talked to about it. * * * I felt outraged, and expressed my feelings.

"Q. Have you ever had any conversation with any drummer in regard to this boycott, or about stopping at the Webb House?

"A. Well, there was one drummer that told me, after our conversation, that he would not stop there. That is all.

"Q. What did you say to the drummer?

"A. I told him about the true bill, and that I felt outraged at his action (Webb's), and he said that he would not stop with no such a damn fellow. I don't know whether he ever did stop there any more or not.

"Q. Have you had any conversation with Mr. Drake about not buying goods from drummers that would stop at the hotel, and about boycotting the hotel?

"A. No, sir; I did not. I might have talked with him and expressed my feelings with him.

"Q. Well, after you expressed your intention to boycott the hotel, did you ever notify anybody of the change of your purpose?

"A. I don't know whether I did or not. I suppose I did, in talk-

ing to my brother, may be, and stated that Capt. Goodwill had talked to me and discouraged me. * *

"Q. The only party that ever approached you was Capt. Goodwill?

"A. Well, yes; I say I talked to my brother and, perhaps, to others, perhaps to banker Miller, when I felt outraged. * * *

"Q. What did you understand was Mr. McIntyre's proposition to you?

"A. He made no proposition to me. He first came up in his blustering way, as the Colonel always does, and he says: 'I want you boys to hands off in this Tandy Webb business.' .

"Q. You told him that you had been imposed upon in this matter, and now you proposed to kick, yourself?

"A. I told him that I had been slapped on one cheek and had turned the other, and now I was kicking."

We, therefore, have it, from Crichton himslef, that he felt outraged by the indictment, that he thereafter told Goodwill that he did not intend to purchase goods from any one who stopped ut the Webb House; that he talked with his friends on the street, in the same strain; that he talked, in the same strain and laboring under the same feeling, to his brother, to Drake, to Miller, and, "perhaps to others:" that after a conversation between him and a drummer (whose name he is unable to remember) the drummer said that "he would not stop with no such a damn fellow" as Webb; and, finally, that either shortly before the institution of this suit, or shortly after it, he replied to the suggestion of McIntyre, that he should "hands off" in the Webb matter, by saying that he had been slapped on one cheek and had turned the other, and that now he "was kicking." McIntyre's testimony upon the subject reads as follows: "* * When I heard the talk on the streets that such a boycott had been instituted, I went to those gentlemen and talked about it. I saw Mr. Drake, Mr. Miller and Mr. Goodwill (they said he was into it), and then the two Crichtons. * * I heard none of them acknowledge that they had entered into any boycott. * * I went to Mr. Drake and told him what I had heard, and he said they had to do something, that Webb had outraged them so, in every way; or something to that effect. I then went to Mr. Miller and told him the same thing about what I had heard, and he told me that there was no boycott as far as he knew. * * Then I went and saw the two Crichtons, together. I saw them in Mr. Jim Crichton's store, and I reported to them what I

had heard. I remember the expression of Mr. Tom Crichton. He said that he had been smitten on one cheek and had turned the other, and he had been smitten on it, and that he thought it was time to kick.

"Q. Well, first state what agreement, if any, they made to withdraw the boycott, and not to do it?

"A. They did not make any agreement not to do it. * *

"Q. Well, these parties that you went to see did not tell you, or did not admit to you, that they had gone into any boycott, did they?

"A. No, sir; not in so many words. * *

"Q. You are a connection, or a relation by marriage. of Mr. Drake, are you not?

"A. Yes, sir.

"Q. He did not solicit you to go into any boycott?

"A. No, sir.

"Q. He did not admit to you that he was in any boycott, did he, in so many words?

"A. No, sir; not in so many words. * * *

      *       *       *       *       *       *

"I told him (Drake) that I had heard on the street that these gentlemen * * (named) had entered into an agreement not to buy goods from any drummers who stopped at his (Webb's) hotel, and that I had also heard that, in consequence, Mr. Webb had instituted a suit, and that I wanted to see if I could not get them to withdraw this agreement and get Mr. Webb to withdraw the suit and settle the matter.

"Q. Did he agree to do it; just state what he said?

"A.. Well, he did not agree, nor disagree, in so many words.

"Q. Can you state whether he agreed, or did not agree. to withdraw the boycott?

"A. He did not do either one or the other.

"Q. Can you state what reply, if any, he made to your proposition?

"A. All the words I remember I stated above; that he stated how badly Mr. Webb had treated him; that he felt outraged at Mr. Webb's action. * *

"Q. What statement did you make to Mr. Crichton, when you went in?

"A. It is my recollection that I made a similar statement, I said:

Here, I want you boys to settle this thing, or something, I don't remember the words."

Drake testifies that he had no agreement to boycott the plaintiff, and that he does not remember that he told any one that he would not buy from a drummer who stopped at his hotel. He does not remember any conversation with Mr. H. W. Smith, and absolutely denies having had any with J. H. Price, nor did he, as he says, participate to any extent in any conversation between Miller and McDonald concerning the boycott.

H. W. Smith gives the following testimony:

" * * * Am a traveling salesman, * * came to Minden about once a week; * * when I began coming here I stopped at the Webb House, * * everybody whom I heard speak about it was well pleased with the service and treatment received at the Webb House. I liked it as a stopping place.

"Q. When did you cease to stop there, and why?

"A. Sometime last spring, don't remember definitely, I came in overland, by train, about that time, and sent my grip to the Webb House. I heard coming down the street, from several sources, can't name the parties, that Mr. Webb had antagonized the interests of the leading business men in Minden, and when I got to Mr. F. H. Drake's, I asked him to explain fully the nature of the trouble, which he did. I told him that in view of the fact of Mr. Webb's treatment of my friends here, I would not patronize Mr. Webb any further, and at once sent a negro for my valise. Mr. Drake did not tell me that they had decided to boycott Webb's Hotel. I changed my hotel, because I was told that Mr. Webb had antagonized the interests of my friends and patrons in Minden, to whom I looked for patronage and business, and not to Mr. Webb. Mr. Drake had told me of the trouble, and I quit on the information I had asked for and received from him. I did not decide to quit until I had the talk with Mr. Drake; all the information I received from Mr. Drake was a history of the trouble between Mr. Webb and the merchants. He did not say anything to me about refusing to trade with me any more, if I stopped at the Webb House."

The testimony, in so far as it relates to rumor, was excluded by the judge *a quo,* on the ground that the plaintiff, having alleged specific acts done by the defendant, to his prejudice, could not be permitted to prove the currency of reports. We think this was error. The

currency of the report that the plaintiff was boycotted by the merchants of Minden was a necessary consequence, if not an intergral part of the specific acts with which the defendants were charged, and was, of itself, calculated to injure the plaintiff's business. One of the defendants, Mr. Crichton, was president of a railroad company, and there is testimony in the record, that the report that the Webb House was boycotted by the merchants was not only current in Minden, but that drummers coming in upon the road heard it before reaching there. It is true that the report is not shown to have been circulated by the employees, but, as the president of the company operating the road had stated, certainly to one person, and, as we think it probable, to a number, that he intended to stop buying from drummers who put up at the Webb House, it is not surprising that, in a small community, such as that in which the statement was made, a strong impression should be produced, and we are of opinion, that that impression is as much a part of the case as the statement which produced it. We also think that the evidence which has been referred to, taken in connection with that yet to be commented on, sufficiently connects both Drake and Miller with the report in question to justify its admission as to them, even assuming that no conspiracy is established.

J. H. Price testifies that he is a drummer and that he has been visiting Minden for six years, and always stopped at the Webb House until some time in the early part of 1898. His examination then proceeds as follows:

"Q. Mr. Price, did either Mr. Thos. Crichton, J. E. Crichton, or Felix Drake, tell you the merchants had boycotted the Webb House?

"A. Neither of the Crichtons told me so.

"Q. Who told you that?

"A. Mr. Drake told me so.

"Q. Well, just state what Mr. Drake told you?

"A. Told me that they had decided to boycott the Webb House; that Mr. Webb had raised the taxes and caused considerable disturbance with the merchants in the town, and that was the only way they had to retaliate.

"Q. Well, how did he propose to boycott, what did he propose in that respect?

"A. Didn't patronize the drummers that stopped there."

CROSS-EXAMINED.

"Q. Do you know how he happened, or how he came to talk to you about this matter?

"A. Yes, sir.

"Q. Well, please state how it was.

"A. Well, I went to sell him goods and he told me he wanted to know where I was stopping—first thing—and I told him I wasn't stopping anywhere, and he told me what I have just testified to a few minutes ago."

At another place, and in direct examination, he says:

"Q. I will ask you whether or not it is well known all over the road, among the drummers, that the merchants had boycotted the house?

"A. That was the report."

It is claimed that the witness confused Mr. Drake with a Mr. Phillips, who testifies that he had some conversation with Price, but as Mr. Drake admits that he knew Price, though slightly, and Price swears that he knew Drake, we find no good reason for supposing that he confused Drake with any one else—more particularly as Price testifies that he was in the habit of visiting Minden every sixty days.

L. W. Stevens is clerk of the police jury and justice of the peace. He once made an effort, before the indictments, to bring about a reconciliation between Drake and Webb, but was unsuccessful. He gives the following testimony:

"Q. State what, if anything, Mr. Drake said to you relative to having boycotted the Webb Hotel? (After some objections and intervening questions, he answers.)

"A. Well, Mr. Drake called me and I went over to his store, in his office: and he said to me, that this man Webb, and he seemed to me to be laboring under, or feeling, violent indignation against Mr. Webb, he said that it seemed as if this man Webb was not disposed to let up in his fight against them, and that they were obliged to fight back. I don't know whether he used—I am inclined to think that he did not use the term boycott. He said that they were obliged to fight back. He did not use the names of any other parties. That is about what he said. * * * I heard of the indictment on Saturday, and that conversation occurred early Monday morning afterwards.

"Q. You have given your evidence against Mr. Drake, and told what he told you, only from a sense of duty?

"A. Well, only as I was obliged to. I could not have been induced to have done it voluntarily."

J. W. McDonald is book-keeper for F. H. Drake, and testifies as follows:

"Q. Mr. McDonald, do you remember Mr. R. H. Miller coming into the office and talking with Mr. Drake relative to not purchasing from drummers who stopped at the Webb House?

"A. Yes, sir.

"Q. Well, state, Mr. McDonald, what was said?

"A. The discussion of the boycott came up and Mr. Miller remarked that it served Mr. Webb right.

"Q. What did Mr. Drake say?

"A. He agreed in the opinion with Mr. Miller.

"Q. When was was that, relative to the report of the boycott?

"A. It was after the report of the boycott.

"Q. Did you make any effort to discourage these parties from engaging in the boycott?

"A. I did not approve of the reported boycott.

"Q. Did you make your disapproval known to them?

"A. Yes, sir. I told them that I thought that it was undignified to take the action.

"Q. What answer did they make?

"A. I don't remember.

"Q. You don't remember Mr. Miller's answer?

"A. No, sir; I told you before that Mr. Miller said that it was no more than he deserved, but, whether it came in at that time I do not know."

### CROSS-EXAMINATION.

"Q. Did any one say anything about the matter, calling it a boycott?

"A. Yes, sir; it was called a boycott, spoken of as a boycott.

"Q. They did not shed any tears over Mr. Webb's losing the trade, but they did not admit that they were parties to it?

"A. No, sir."

Mr. Riser testifies that he sells hardware, and has been visiting

Minden as a drummer for about a year and a half, and was in the habit of stopping at the Webb House.

"Q. When was the last time you stopped at the Webb House?

"A. Well, I don't know the date; I think it was sometime in February, though.

"Q. Well, before you reached Minden were you warned by anyone not to stop at the Webb House?

"A. Yes, sir.

"Q. By whom?

"A. I think, Frank Gladney.

"Q. Who else?

"A. Ganucheau.

"Q. Well, I ask you, as a fact, was it not known all over the road that the Minden merchants had boycotted the Webb House, among the drummers?

"A. Yes, sir; we heard that."

Ganucheau, who is mentioned by this witness, was a New Orleans drummer, with whom, according to his own testimony, Mr. T. Crichton had some conversation, the effect of which is thus discovered in the testimony of Riser.

Plaintiff offered to prove that the fact of the boycott was also made public through the Minden press, but this evidence was excluded. For the purpose of the trial, the plaintiff's counsel moved for an order upon the defendant, Miller, to produce in open court certain correspondence, and, in this motion, to the truth of which he swears, he says:

"That he believes that R. H. Miller, one of the defendants, has letters and correspondence in his possession, or under his control, by himself and C. S. Chapman, which are competent, material and necessary evidence in his behalf in this case. That he can show, by said correspondence, that R. H. Miller wrote to C. S. Chapman telling him that if he wished to sell goods to any of the Minden merchants, when he came to said place, that he had better not stop at the Webb House, or that he should stop at the Taylor House, and that said Miller would explain the reason when he saw the said Chapman."

The order was made as prayed for and the defendant Miller made a sworn return as follows, to-wit:

"Into this cause, in open court, R. H. Miller appears and for answer to the rule to produce letters and copies of letters between

himself and Mr. Chatman, shows that he has no such letters and copies. He produces, annexes hereto, letters and copies of letters from *Mr. C. S. Chapman,* and avers that same are irrelevant to the case, and hearsay, and not receivable in evidence against the defendants. That he kept no copy of the letter he wrote Mr. Chapman, but same made no reference whatever to the alleged boycott, and made no intimation and gave no thought that the defendants would not trade with him if he stopped at the Webb Hotel. He herewith produces the letters he supposes he is ruled to produce, and all on the subject matter in his possession."

The correspondence which is thus produced, consists of:

1. A letter from Chapman to Miller, dated Shreveport, February 28, 1898, which is unimportant here.

2. A letter from Chapman to Miller, which reads as follows:

PINE BLUFF, Ark., 3, 30, 98.

"Dear Miller—I hand you a letter just received from Mr. Webb " and a copy of my reply. I send also your last letter to me. Refer- " ring to Mr. Matthews, I do not remember to have used your name " in the matter, but will not say that I did not do so. I have known " the latter gentleman for a number of years and did not believe that " he would quote me as his authority, whether I mentioned names or " not.    While I attached, at the time, little importance to the " incident, my curiosity got the better of me, and, in trying to ascer- " tain what the cause was, I talked a little too much. No one could " possibly regret the whole affair more than I do. This will be a " lesson that I will not soon forget, that is '(not?)' to report what I learn.

"Your friend,

"(Signed)   C. S. CHAPMAN."

3. The letter from Webb to Chapman referred to in the foregoing, which reads as follows:

MINDEN, LA., March 26th, 1898.

"Mr. C. S. Chapman, Galveston, Texas.

"Dear Sir.—Mr. R. J. Matthews told me that R. H. Miller, the " cashier of the Minden Bank, wrote you a letter telling you not to " stop at my hotel when you came to Minden. I wish you would send

" me the letter, or a copy of it containing the contents of the letter as
" near as you can recollect it.  I am making preparations to sue them
" for damages in boycotting and breaking up my hotel business here
" in Minden.

"Your friend,

"T. T. WEBB."

4.  Letter from Chapman to Webb in reply to the foregoing, being
also one of the enclosures referred to in Chapman's letter of March
30, 1898, to Miller.

"PINE BLUFF, ARK., 3, 30, 98.

"Mr. T. T. Webb, Minden, La.

"Dear Sir.—Replying to your letter of the 26th inst., I beg leave to
" say that the letter has not been in my possession for some time, but
" from my recollection of its contents, I do not believe that there was
" anything in it that would assist you in winning a damage suit.

"Yours truly,

"C. S. CHAPMAN."

There are two circumstances which attract attention in reading the
letters thus produced by Miller, and in considering them in connec-
tion with his sworn return.  (1) In Chapman's letter to Miller, he
says that he encloses the last letter which he received from Miller, to-
gether with Webb's letter to him and his reply thereto,—in which re-
ply he tells Webb that Miller's letter, for which Webb had written,
had been out of his possession for some time—and yet he encloses the
very letter, for which it seems probable Webb had written to Miller—
with a copy of his answer to Webb denying its possession, his letters
to Miller and to Webb bearing the same date.

2.  Miller states in his return that he kept no copy of his letter to
Chapman, which he is called on to produce, and that he produces all
on the subject matter in his possession.  He produces Chapman's
letter to him, with two of the enclosures to which that letter refers,
i. e., Webb's letter to Chapman, and a copy of Chapman's reply; but
he does not produce the third enclosure to which Chapman refers—
being the letter written by himself to Chapman—which Chapman
wrote to Webb had been out of his possession for some time, and
which he appears to have returned to Miller, and which he, Miller,
was called upon, specifically, to produce, by a sworn rule in which the
plaintiff notifies him of what he expects to prove by it.

If Miller has not this letter in his possession, what has he done with it? He certainly owed it, as well to himself as to the court, to make some explanation, and in the absence of any explanation, the court must presume that the letter, if produced, would prove what the plaintiff states that it would prove, i. e., that Miller wrote to Chapman warning him that if he wished to sell goods in Minden, he had better not stop at Webb's Hotel.

Upon the basis of this evidence, and of the surrounding circumstances, we are forced to the conclusion that Miller, Drake and Thomas Crichton, were intensely exasperated against the plaintiff, and determined to retaliate, in kind, for what they conceived to be injuries received at his hands, consisting, as it appears, of what they considered over-assessment of property in which they were interested, and proceedings against them for failing to make returns. The evidence shows that they were among the most influential business men in Minden. As merchants, the two Crichtons (each having a separate store) and Drayton are said to do more business than all the other merchants in the town combined, and they buy largely through drummers. In addition to this, they are presidents and stockholders of, and in, various business corporations. Miller, also, is a man of position and influence, being cashier of, and stockholder in, the only bank in the place. We think that the evidence justifies the conclusion that they determined, as a measure of retaliation, to use their influence to destroy the business of Webb's Hotel by withdrawing from it the drummer patronage upon which it relied. Whether they entered into a formal or an informal, a written or an unwritten, agreement, or contract, to that effect, is wholly immaterial. That the matter was discussed between them is beyond all question, and each acted with knowledge that the other was acting upon the same lines, and for the accomplishment of the same purpose. The fact that they were inimical to the plaintiff and would not favor, in a business way, those who patronized his hotel, was made so widely known that drummers approaching the town were informed of it before reaching there, and the information appears to have reached them in such a way as to suggest that the boycott was participated in not only by those who originated it, but by all the merchants in the place. Smith, one of the drummers, testifying for himself, says, in substance, that, in visiting Minden, he was not looking to the hotel for patronage, but to the merchants. And that,

as the hotel-keeper antagonized his friends and patrons, he withdrew his patronage from the hotel. And, through Smith, it may safely be said, we hear the testimony of every drummer on the road. Their business in Minden was to sell goods and when those to whom only they could make sales, gave it to be understood, and made it a matter of public notoriety, that they would not buy from persons patronizing a particular hotel, they may have felt some curiosity, as Chapman expressed it, to know why it was, but beyond that the affair did not concern them—nor were they likely to take any chances. They simply ceased to patronize the objectionable hotel and preserved their trade.

The boycott was declared during the last days of February, or the first days of March; the business of the hotel almost entirely ceased, and the plaintiff closed it for business purposes, about March 25th. It has been suggested that he closed up under the advice of counsel in order to put himself in a position to bring a speculative damage suit. We are not so impressed by the evidence. Upon the contrary, it appears to us that it would have been utterly useless, under the circumstances, for him to have attempted to continue in business. So long as the defendants maintained the attitude, which they had assumed, he could have done no business which would have justified his keeping the hotel open, and he could not have been expected, even had his finances permitted, to await their pleasure or mercy. The "good will" of the business was, for the time, destroyed, and the plaintiff had no power to revive it. It rested entirely with the defendants to say when, or whether, that tendency of the drummers to patronize the hotel, which constituted that "good will," should be unfettered of the shackles which they had placed upon it; and, in the meanwhile, the plaintiff might starve. For him to have temporized would, therefore, have been, to say the least, unwise. Hence, he accepted the situation, and closed up his house.

He appears, thereafter, to have endeavored to rent, but as he wished to make some arrangement to board (with his family) with the lessee, he found some difficulty in doing so. Eventually, however, at the expiration of about ten months, he found a tenant in the person of the book-keeper of one of the defendants, who, as we understand it, carries on the business through a young gentleman, who is a clerk in the same establishment. The furniture is not included in this lease,

but has been disposed of, some of it sold at a sacrifice and some of it stored.

The business thus destroyed, afforded the plaintiff a living for himself, wife and two children. He kept no books and testifies in a general way, that they made $50 to $60 per month after paying expenses; and that his expenses were $300 per month. In order to sustain these estimates, he must have had an average of six guests per day, at $2 each, which was the charge for transient guests. The witnesses all concur that he was doing a good business, speaking, of course, in relative terms, and the weight of the evidence justifies the belief that he had two-thirds of the drummer patronage. We think, however, that six guests per day would be a high average, and that the plaintiff's estimates of his receipts and expenditures are somewhat at large. The property itself is not shown to have depreciated in value, and is rented for about ten per cent. of its cost. Plaintiff testifies that he has sold about half of his furniture, the whole of which cost him $1,500, at a loss of some fifty per cent. upon the cost price.

The question, then, is as to the *quantum* of damages. The claim, as made, is divided into two elements, destruction of business with loss of profits, distress and annoyance, and injury to character, to which is added a demand for the infliction of punitory damages. We should find some difficulty in dealing with the question of injury to character, for the reason that testimony offered on behalf of the defendants, as to the estimation in which plaintiff is held in the community in which he lives, offered in mitigation, was excluded in the lower court; but, as we believe, that it will rather conduce to the 'ends of justice to dispose of the case as we have it than to remand it, this element of damage may be regarded as eliminated. Loss of profits is conjectural and uncertain, but the good will of an established business has usually a market value, and is frequently the subject of barter and sale. The plaintiff has shown actual loss in the sale and storage of his furniture, and in the distress and mortification consequent upon the position in which he has been placed. A settlement and a home, apparently, for life, has been broken up; these elements of plainly established injury, we think, warrant judgment for fifteen hundred dollars. The defendants, that is to say, Thomas Crichton, Miller and Drayton, are also liable in a further amount, as punitory damages. James E. Crichton, the other defendant, is not shown by

the evidence to have participated in the infliction of the injury of which the plaintiff complains. With respect to the other defendants, named, whatever feeling of personal resentment they may have entertained against the plaintiff, and whether well or ill-founded, it will hardly be claimed, nor do we believe that it would have occurred to either of them, that they would have been justified in gratifying that resentment by burning the defendant's hotel; and yet, whether regarded in its legal or moral aspect, there is no great difference between destroying the hotel and destroying the business conducted in it. If the one sheltered the plaintiff and his family the other provided for them. Nor is there a better light thrown on the matter by the fact that the keeping of the hotel was the particular work to which the plaintiff's wife had devoted herself. The defendants exerted themselves, and successfully, to defeat the plaintiff's appointment to succeed himself as assessor. This they had a right to do, if they considered him an incompetent officer, or if they believed that some one else would better fill the place. But no one complains of his wife as superintendent and manager of the hotel. Every witness examined in the case, who was interrogated upon the subject, testifies that the hotel was well kept, and, whilst we hold that the plaintiff has a standing and an interest to bring this suit, it is nevertheless true that his wife had an interest in the hotel business which aside from other considerations, might well have obtained for it immunity at the hands of these influential citizens, whom she, at least, had not injured. The defendants had power and influence which they used lawlessly and ruthlessly, and the interests of the community and of justice require that a penalty should be imposed upon them. And this penalty, we fix at five hundred dollars.

It is therefore ordered, adjudged and decreed that the verdict and judgment appealed from, in so far as the same condemns the defendant, James E. Crichton, be annulled, avoided and reversed, and that the demand of the plaintiff as against said James E. Crichton be rejected. And, in so far as said verdict and judgment condemn Thomas Crichton, Felix H. Drake and Robert H. Miller, that the same be amended by increasing the amount thereof from five dollars to two thousand dollars. It is further ordered that the costs of the appeal be paid by said three last named defendants, as also the costs of the lower court, with the exception of those incurred by James E. Crichton, which shall be paid by the plaintiff. It is further ordered

that, as thus amended, the judgment appealed from, against said three last named defendants, be affirmed.

Rehearing refused.