HARDY, Judge.
This is a suit seeking the issuance of a permanent injunction against the alleged violation of the restrictive covenant against competition included in an act of sale. The plaintiffs are named as F. (Frank) J. Roberson, the S. & R. Gas Company, Inc., and Campti Butane, Inc. The corporate plaintiffs are engaged in the business of the retail sale of liquefied petroleum gas, butane and propane, in an area comprising some ten or twelve parishes in the northern part of the State of Louisiana. The plaintiff, Roberson, is a stockholder, officer and executive of the said corporations.
The petition named the defendants, against whom the ■ injunctive relief was •prayed, as being Albert L. and John -S. Stephens, father and son, residents of Red River, Parish. ' '
An exception of ho cause and no right of action interposed on behalf of the defendant, John S. Stephens, was overruled. Following trial on the merits there was judgment in favor of defendants rejecting plaintiffs’ demands, from which plaintiffs have appealed.
The facts of the instant case are of primary importance in a consideration of the issues tendered by this appeal, and, accordingly, it is necessary that they be set forth in considerable detail.
It is established that the plaintiff, Frank J. Roberson, and the defendant, Albert L. Stephens, were members of a partnership engaged in the sale of liquefied petroleum gas products with the main office of the enterprise located in the Town of Cou-shatta in Red River Parish. In 1945 these individuals incorporated the business under the corporate name, of S. & R.. Gas Company,- Inc., and each ¡ of the partners became owners of 50% of the stock of the said corporation. In 1948 the same individuals organized Campti Butane, Inc., and again equally divided the stock between them. The same individuals apparently were interested in the organization of a third corporation, the S. & R. Tank Line, Inc., which corporation, however, is' not named a party to this litigation and the operations and interests 'of which have no material bearing upon the case.
From about the year 1948 until November 12, 1954, the defendant, Albert L. Stephens, served as President of the named corporations, and, on the latter date, he was receiving as compensation for his services in such capacity a total salary from the three corporations of slightly less than $18,000 per year. During the same period the plaintiff, Roberson, was the secretary of the corporations and, so far as can be determined from the record, was in charge of sales and operations. At some undisclosed date, but during the year 1954, differences developed between these *490 associates which made -desirable the dissolution of their joint business interests. From August until November, 19S4, each of the partners was clearly cognizant of the need to make some disposition of their corporate holdings which would eliminate the unfortunate friction between them, either by sale of the corporations and their business to a third party, or by the sale of the stock of one to the other. Early in the 'month of November, 1954 the defendant,’ Albert L. Stephens, requested the attorney for the corporations, who represents the plaintiffs in this suit, to attempt to procure a buy-or-sell proposal from Roberson. The attorney complied with this request and on November. 10, 1954 he tendered to Albert L. Stephens, on behalf of Frank J. Roberson, a buy-or-sell proposition.
• Under the terms of the offer made by Roberson he agreed to sell his interest in the three corporations to Stephens for a -cash consideration of $120,000; alternatively, Roberson proposed to buy Stephens’ entire stock holdings in the corporations for a cash consideration of $125,000. The 'proposal was made' subject to immediate acceptance.
Under the- terms of the offer made by Roberson, the offeree was presented with three very clear choices. Stephens was at liberty (a) to sell his stock to Roberson for $125,000 cash; or (b) to purchase Roberson’s holdings.in the corporations for the sum of $120,000 cash; or (c) to refuse to buy or sell and await some future resolution of the impasse.
It is noted from Stephens’ testimony that he felt he was handicapped by reason of -the time limitation inasmuch as the offer was tendered about or after the close of banking hours on November 10th immediately preceding a banking holiday on November 11th. While this is true, it is not .shown that Stephens was necessarily prejudiced in any manner or degree. It is evident that the situation had not been one of rapid development, but, as above stated, had been known to both parties for some months. ..There was no compulsion upon Stephens to take any action, and his voluntary decision to sell was the result of the free exercise of his own best judgment under the existing circumstances.
On November 12, 1954 a written agreement was confected, which agreement was duly executed by Albert L. Stephens and F. J. Roberson, the latter appearing both individually and as secretary of the three corporations. The defendant, John S. Stephens, also appeared and executed the agreement as a party thereto for the purpose which is hereinafter particularly set forth in the appropriate contractual provision of the agreement itself.
Under the terms of the agreement and contract of November 12, 1954, Albert L. Stephens sold to F. J. Roberson all of his .stock in the corporations, consisting of 1,-625 shares of the capital stock in the S. & R. Gas Company, Inc., 20 shares of the capital stock of the S. & R. Tank Line, Inc., and 50 shares of the capital stock of Campti Butane, Inc., together with all interests, equities and rights the vendor might have or possess in the three corporations.
Stephens also sold and transferred all his good will for and on behalf of the said corporations. Under the provisions of the agreement all salary commitments in favor of Stephens from the corporations terminated as of the date of the agreement. The consideration provided for the payment of a total sum of $125,000; $10,000 of which was paid contemporaneously with the signing of the agreement, payment of the balance of $115,000 being obligated to be made by Roberson on or before December 1, 1954. As further consideration Roberson obligated himself to procure the release of the vendor, Stephens, from certain specifically named obligations of the corporations represented by negotiable paper personally endorsed by Stephens, in the •aggregate sum of $118,138.90. The agreement further provided that policies of life *491 insurance issued upon the parties, Roberson and Stephens, naming . the S. & R. Gas Company, Inc. as beneficiary,' were declared to he the personal property of the named individuals. Under this provision a policy issued upon the life of Albert L. Stephens, having a cash surrender value of $4,050 at the time, was surrendered and delivered to the said Stephens.
The contract contained certain provisions with reference to forfeiture of the agreement, in the event of failure of compliance by Roberson, which are immaterial, in view of the fact that the obligations were timely made and discharged. On or about November 29 or 30, 1954, Roberson fulfilled the contingent provision of the agreement by making payment of the balance due, in cash, and by furnishing complete release of the personal obligations of Albert L. Stephens on the corporate indebtedness above mentioned as having been specified in the agreement.
’ There is no dispute that as of December 1, 1954, the parties had complied with and fully executed the principal obligations set forth in the agreement.
The cause of action relied upon by plaintiffs in this suit is predicated on allegations that the defendants have violated the restrictive covenant which was embodied in the agreement of November 12, 1954, and which reads as follows:
“The good will which he possesses for the continued success and prosperity of the S. & R. Gas Company, Inc., the Campti Butane, Inc., and the S. & R. Tank Line, Inc.,-and, to guarantee the continuance thereof, he obligates himself to the three named corporations, and. to F. J. Roberson, not to independently, that is in - his own name, or thru a corporation in which he owns stock, or a partnership in which he has an interest, engage in the liquefied’petroleum business for a period of five years from daté hereof in the area served by the S. & R. Gas Company, Inc., and the Campti Butane, Inc.”
Another provision of the agreement which involves, in some degree, the ques-. tion of the liability of defendant, John S. Stephens, is found in the recital of the agreement which reads as follows:
“And, now, appeared ’John S. Stephens for the express purpose of de-daring that, for an adequate consideration, he assigned and delivered the heretofore described stock certificates, listed in his name, to his father, A. L. Stephens for transfer to F. J. Roberson under the terms of this agree- . ment.”
By way of explanation of the necessity, or desirability, of the appearance to and execution of the agreement by John S. Stephens, we recapitulate as briefly as may be possible the basis of John S. Stephens’ interest in the transaction. Certificates No. 26 and 27, each representing an interest of 100 shares in the capital stock of S. & R. Gas Company, Inc., were acquired at some time in 1954 by John S. Stephens by way of a gift from his father, Albert L. Stephens. Both of the Stephens testified that this gift, was made’sometime in April of 1954, but the certificates in question which were introduced in evidence bear the usual form of transfer and assignment signed by Albert L. Stephens, conveying the stock represented, on date of July 31, 1954. In any event, the certificates were delivered to John S. Stephens, who placed them for safe-keeping in his father’s safe deposit box in the Bank of Coushatta. These certificates, together with certificates representing all the stock holdings of Albert -L. Stephens, were removed from the safe deposit box and delivered in, escrow at the time of the execution- of the agreement of November 12, 1954.' It is further to be noted that the certificates bear an assignment and transfer in blank signed by John-. S. Stephens. Just why the appearance toi and. execution of the agreement on the part of John.'.S. Stephens was deemed nec *492 essary is not made clear. The stock had never been transferred on the books of the corporation and the reassignment to Albert L. Stephens could have been perhaps more easily accomplished by the parties availing themselves of the transfer and assignment of John S. .Stephens. However, and whyever this may have been done, it is clear that John S. .Stephens became a party to the agreement.
It is contended by plaintiffs, inasmuch as the agreement recites that the transfer of the corporate shares by John S. Stephens to his father, Albert L. Stephens, “for transfer to F. J. Roberson under the terms of this agreement” (emphasis supplied), the effect was to bind John S. Stephens by the provisions of the agreement. To the contrary it is urged on behalf of defendant,. John S. Stephens, that his execution of the contract was purely pro forma and designed for the accomplishment of the limited and restricted purpose described as.the assignment of the certificates of stock to his father for transfer to Roberson.
It is established that Roberson negotiated a loan in the sum of $235,000 with the First National Bank & Trust Company at Tulsa, Oklahoma, on November 17, 1954, which agreement . was recorded in the Mortgage Records of Red River Parish on November 19, 1954. The proceeds of this loan were u.sed by Roberson for .the payment and discharge of his obligations to Stephens under their contract of sale and purchase of stock'.
Plaintiffs .allege that Albert L. Stephens, with knowledge of the loan iagreement and for the “malicious purpose” of effecting financial damage upon plaintiff, Roberson, thereby- preventing the carrying out of the loan agreement, conceived and put into execution a deliberate plan to -enter the liquefied petroleum business in the area in which plaintiffs operated, and, by reducing the retail price, render plaintiffs’ operations unprofitable. It is further alleged that this plan was carried out in con.cert with his son, John S. Stephens, whose name was used as a subterfuge and as a front in the effort to avoid liability under the plain terms of the restrictive covenant incorporated in the contract of November 12, 1954. On this general basis, amplified by detailed allegations, plaintiffs prayed for a permanent injunction against Albert L. Stephens and John S. Stephens, enjoining, restraining and prohibiting them, and each of them, from offering for sale or for selling at retail under the trade name of Eagle Gas Company, or otherwise, liquefied petroleum gas products in the territory in which the corporate plaintiffs were doing business on November 12, 1954, as specifically designated in plaintiffs’ petition. Plaintiffs further prayed, in the alternative, for such measures of relief as might be supported under the facts established on trial.
We think it unnecessary to set forth the particular detail's of plaintiffs’ claims and will, accordingly, confine ourselves to an analysis of the facts, which we,regard as having been established on trial, and the legal effects thereof.
'The testimony, of Albert L. Stephens admitted his serious .dissatisfaction with the trade he had made with Roberson, and, implicit in his testimony, is the fact that he made known this dissatisfaction in general conversation, with .various and sundry ¡individuals and that he felt he had been unfairly treated. It is worthy of note that the defendant, Albert L. Stephens, offered no reasonable explanation • -which ' justified his feeling of dissatisfaction and it is apparent'to us that this feeling of dissatisfaction arose purely and simply as the result of Stephens’ amazement at the knowledge that' Roberson had been’ able to borrow $235,000 -in order to carry -out' his contractual obligations for the purchase of stock. Careful examination of the voluminous record has failed to disclose any element-of unfairness on the part of Roberson, who made a bona fide .buy-and-sell proposal, as has been detailed- supra.
*493 The merit of plaintiffs’ contentions must rest upon a chain of circufnstances which wé' think has been conclusively proven. The exact chronology of the occurrence of these events -is not established by the testimony of the witnesses, but approximate dates have been sufficiently attested to permit a chronological outline. There is no question as to the fact that, following his execution of the agreement of Noveim ber 12th, the recordation of Roberson’s loan agreement on November 19th,, and the receipt in full of the considerations of the sale on or about the 29th or 30th of November, Albert L. Stephens, over a period of several weeks, made certain derogatory, statements about Roberson, specifically that Roberson had “beaten” , him (Stephens) ; that he (.Stephens) had been “gypped out” of $70,000; Nor is- there any doubt but that Albert L. Stephens frequently and publicly declared his intention of “breaking Frankie Roberson.” It has' been further proven that Albert L. Ste-. phens advised some individuals either that he was organizing, or “we” were organizing, or that a business was being organized, for the purpose of. selling liquefied, petroleum gas products at twelve cents, which was three cents below the then -prevailing retail market price. It was ^proven that -Albert L. Stephens stated on a number of occasions, and to a number of individuals, that he knew that Roberson’s enterprise could not profitably operate at such a price.
We think the proof is overwhelming, and we so hold, as a fact, that Albert L. Stephens, actuated by a desire for revenge for some fancied injustice, set about, 'almost immediately following the sale of his stock in the plaintiff corporations, devising a'calculated plan fqr the establishment .of a competitive enterprise, having for' tÜá purpose of such action the fináncial embarrassment and- possible bankruptcy' of Roberson and his associated corporate enterprises.
This conclusion' does not rest alone upon the testimony of witnesses, but it. is substantiated by a course of conduct which clearly establishes the- improper, motives which influenced the defendant, Albert L. Stephens.
This chain of events begins at some time during the latter part of November, or the early part of December, when Albert L. 'Stephens and his son, John S. Stephens, visited the office of an attorney-at-law some 75 miles or more distant from their home in Coushatta. On cross-examination the following question was asked of and answered by Albert L. Stephens:
“Q. What was your purpose in going there? A. To See how — the signature that John had on the contract, if he was prohibited or how much I was affected from being.”
,:Y,et on direct examination later during the trial Albert L. Stephens testified:
“Q, You realized at that time that you were bound by the terms of the contract not to enter into tire butane •gas business? A.' - I knew then. I have known it all along, sir.”
Still later, counsel for defendant -asked Mr. Stephens:
“Q. Mr. Stephens, will you .state whether or not you visited legal counsel, shortly after your sale to Frank Roberson,- and whether or not that legal counsel advised you, to avoid," directly or indirectly, any relationship, directly or indirectly, in any butane gas business whatsoever in the restricted area?”
To which question the witness replied:
' “A. Yes, sir.- I> visited-legal counsel and I was cautioned, .hot — Uhat-the-• ■'■contract,' so far -as"I was'-concerned was a contract, and- for me not to actively or in any. wise, associate myself with the butane business.”
The time of this occurrence- was fixed by the witness in answe.r ,to a. question of the court:
*494 “Witness: I believe it was- the latter part of November, or it may have -been the first part of December. If I could get it in relation to the time that I was paid, which was approximately the first of December — Within those two weeks, whether prior or after the first, I am quite sure, Your Honor. I can’t pin-point the date exactly, sir.
“The Court: You say either the1 last week of November or the first week' of December?
“The Witness: I would say that, and I think I am correct, sir.”
It is scarcely necessary to comment upon the obvious fact that Mr. Albert L. Stephens did not need to consult a lawyer for the purpose of procuring advice as to the effect of the restrictive covenant into which he had entered. The wording of the restriction is so clear and unambiguous that it can be readily understood by any normally intelligent person, Mr. Stephens is far above the average level of intelligence. The record before us attests to the fact that Mr. Stephens is a capable, experienced and sagacious man of business, and it is inconceivable that he would need instruction as to the effect of the limitations upon his own activities which he had voluntarily assumed. We are certain that Mr. Stephens never, at any time, labored under any danger of misinterpreting. his agreement, and, in his own words, he knew he was bound by the terms of the contract and had' known it “all along.”
It follows, in our opinion, that the real purpose of the conference between the Stephens and their counsel was intended to define’the right of John S. Stephens to enter the business of the retail selling of liquefied petroleum gas products. ,
Continuing with the narration of the chain of circumstances to which we above referred, it is next' important to point out that- on or about -December 1/ 1954- Albert L. Stephens made and signed a check payable to his .son, John Stephens,- in the sum of $15,000.. This check, endorsed by the payee and introduced in evidence on trial of this case, indicates that it was paid by the Bank of Coushatta on December 7, '1954. On or about December 8, 1954, Albert L. Stephens and John S. Stephens paid a visit to the offices of the J. B. Beaird Company in Shreveport and there discussed with one Melvin A. Finuf, Assistant General Manager of Sales for said company, the price" of storage equipment necessary for the conduct of a liquefied petroleum gas business. John Stephens placed an order with the Beaird Company for certain storage equipment, which order was filled and the equipment delivered on a designated site in the Town of Coushatta on or about February 24, 1955. At the time of delivery John Stephens was in Baton ■Rouge, where he had gone about February 1st for the purpose of enrolling in the School of Law of Louisiana State Univer-sityi The equipment was for delivery, C. O.D., and the agent of the Beaird Company, after contacting someone at the home of Albert L. -Stephens, made the delivery and was paid by a check drawn on the account of John S. Stephens in the Bank of Coushatta, which check was signed “John S. Stephens, by Albert L. Stephens, Jr., M.D:” Dr. Albert L. Stephens, Jr., is-a brother of John'Stephens and he testified that he was authorized by the latter to sign checks on his account.
There was some difficulty experienced in connection with the placing of the storage tanks and .equipment, and it was necessary to hire extra labor for this purpose. When the tanks had been properly oriented, the defendant, Albert L. Stephens, was called upon for payment, whereupon he pointed to one of the Negro laborers present, who was identified as Monroe Malone, who paid, in cash out of his^ own pocket, the charges for this work. Mr. Stephens testified that Monroe Malone was a partner of his in the cattle business and the husband of his cook. There is no showing that Monroe Malone had any- reasonable connec *495 tion with this matter, and" the inescapable conclusion is that he was directed by Albert L. Stephens to make this payment in order that Stephens might not later be charged with having any direct and personal connection with the matter. ■
Prior to the delivery of the equipment, it was developed on trial that Albert L. Stephens had interested himself in making inquiry as to the availability of suitable property upon which his son might make a location of his storage equipment. It is true that the transaction for the property was negotiated and concluded by the defendant, John Stephens.
On March 1, 1955 John S. Stephens began the business of selling liquefied petroleum gas products under the trade name of Eagle Gas’ Company. Trucks which John Stephens had acquired for the purpose of distribution of his products covered the territory in which the plaintiffs were engaged in operating.' Upon beginning business John Stephens fixed the price of gas at twelve cents, a reduction of three cents in the established market price, which action, of course, necessitated .a reduction by other distributors in order to meet the competition. This decrease in price had been anticipated by a number •of consumers, who had been contacted by Albert L. Stephens. This defendant testified, quite frankly, that he had taken occasion to mention the’ proposed advent of his son into the liquefied petroleum gas business to his friends, assuring them that both he and John would appreciate their business.
The business of the Eagle Gas Company is ostensibly conducted by John S. Stephens, a law student of L.S.U. in Baton Rouge. ’The staff of employees of the company consists of a part-time bookkeeper, who is regularly employed in the Coushatta Post Office, and two tank truck drivers, who are employed on a commission basis. The testimony as to the profit and loss condition of the business is somewhat sketchy and does n'ot justify the-expression, of an opinion as to its soundness as a business venture. ^John Stephens contends -that he has invested about $20,000 in' the business and that.he shows a satisfactory prófit on his . operations. This defendant further testified that he is the sole owner of the business and that he developed and , put into, execution the entire idea. This testimony, standing alone, would serve to have What is clearly the intended effect of exonerating Albert L. Stephens from any connection with the business of the Eagle Gas Company. Unhappily for this desired result,’ all of the circumstances and all’ of the proof adduced must be considered in leading to a conclusion, and ’such consideration militates preponderantly against the defendants’ position.
! We' accept much of the testimony as to the ill-advised 'declarations of Albert L. Stephens' as 'simply reflecting the intemperate expressions of a man who had yielded 'to' anger against one whom he believed had inflicted upon him some injustice. By. eliminating all that might be charged to this cause there still remains the clear’ picture of the careful and immediate development by Albert L. Stephens of a plan and scheme designed to bring about the financial embarrassment, and quite possibly the financial ruin; ’of the plaintiff, Roberson. It is amply demonstrated bf the 'evidence in this case that Albert - L. Stephens had never suggested, during- his long business connection with Roberson and his active interest in these corporations, the reduction of the price of the products which they were selling. Yet no s'ooner was Stephens paid the consideration upon which'he had agreed for the sale off his stock than he undertook the active sponsorship of a competing business; -The' price reduction ’ was an essential element of his plan. : ’
The conclusion appears to us 'to be inescapable that Albert L. Stephens, by word and deed, was guilty of violation of both the letter and the spirit of the re *496 strictive covenant into' which he had ’entered under the provisions of. the agreement of November 12, 1954. ,It follows that plaintiffs are entitled to the.--relief sought as against this defendant. . .•
It now becomes necessary for us to proceed to a consideration of the relationship of John S. Stephens and his involvement, if any, in the plan designed by his father.
As above noted, John Stephens testified that, the organization of the Eagle Gas Company and the sale of liquefied petroleum gas products at a three-cent reduction in price was his own idea and was intended as the beginning of a development which would give him a prosperous business in addition .to his practice of the profession of law, for which he has been engaged in study since February 1, 1955. We think it most significant that there is not' one word of evidence in the .record 'which would indicate that John -Stephens had ever given -any thought or any. consideration to an independent , entry into, this particular character of business .prior to the time his father had evidenced his angry dissatisfaction concerning the trade he had made with Roberson.-. The first step taken by -John- S. Stephens. with respect to the formation a'nd operation of an independent business can be definitely identified- as the occasion upon which, in company- with his father, he consulted an-attorney,-ostensibly with reference tp his- right so’ to do. From this point preparatipns rapidly developed; receipt, of $;15,000.as consideration for the. sale of 200 shares of-stock-; a conference and order -for storage equipment acquisition of the site for such storage; acquisition of transport trucks; employment of necessary personnel, and the actual commencement of operations within a space of three months, during the last month pf which period John S. 'Stephens was at school in Baton Rouge. These developments could scarcely be regarded as coincidental, and, when the activities of Albert L. Stephens are taken into consideration; we believe .the possibility of coincidence, is. completely negated.
Still another circumstance is pertinent. -Conceding the validity and accepting as unsuspicious the circumstances of the gift of 200 shares of stock from the father, Albert L.. Stephens, to one of his sons, John S. Stephens, ,we are confronted with the unusual coincidence of the relationship between the amount received by the son for the' salé of the stock and what appears to -be the approximate amount of his initial investment in the Eagle Gas Company.
Copies of the income tax returns for the taxable year 1954, as filed by Albert L. Stephens and John S. Stephens, were introduced in evidence and we regard the disclosures made in these returns as having a material bearing, upon the factual issues of this case. The return of Albert L. 'Stephens shows that he reported the sale of his stock as being a 50% interest in the S. & R. Gas Company; Campti Butane, Inc., and S. & R. Tank Line of Coushatta. The taxpayer returned the gross sales price of this stock as being $68,215.70. It is possible to reconcile, this amount with the full cash consideration of $129,050, received by Albert L. Stephens, by the deduction of $60,834, which represented the indebtedness of the corporations to Albert L. Stephens, personally, as of November 12, 1954. In other words, the amount of the cash consideration of $129,050, less an indebtedness of $60,834, fixes the gross sales price as being $68,216. Actually, it is noted that this figure was represented on the taxpayer’s return as $68,215.70, leaving an unimportant discrepancy of thirty cents. Stephens showed the cost price of the stock as being $97,421.63, and therefore claimed a net loss on the total sale of his stock holdings of $29,205.93.
Neither Albert L. Stephens nor John S. Stephens made any return which would explain the amount of $15,000 received by John 'S. Stephens either under the classification of income or gift.
It is evident, from the figures immediately above set forth, that Albert L. Stephens *497 included the sale of this stock in his tax return and received the entire benefit ■ of the loss claimed therefor.
In his return Albert L. Stephens fixed the gross value of the 1,695 shares of stock conveyed to Roberson at a figure equivalent to almost exactly $40 per share. On this basis the value of the 200 shares-of stock, which had been given to his son, John S. -Stephens, would amount to $8,000. The method by which Albert L. Stephens arrived at the computation of the payment which he made to his son is1 somewhat involved, but we give it below as it appears in the testimony of Albert L. Stephens:
“ * * * I thought when I gave him the stock that they were hundred dollars par value; I thought I was giving him twenty thousand dollars worth of stock. When I didn’t get as much for my stock as I thought it was worth then I didn’t pay him as much. I have gotten a hundred and twenty-five thousand dollars for my half of the stock — the number was around, well it was sixteen hundred and ninety-five shares. He owned two hundred. Two hundred of them is approximately an eighth of them. Eight times fifteen is a hundred and twenty thousand. That’s rough figures. That’s the way I did it. It was my son that1 owned the stock. I don’t mean that I would have done that with an outsider. And then there were sixteen hundred and ninety-five shares.”
We think there was a more compelling reason which motivated the valuation of the stock at $15,000 and this was the fact, as was clearly established on trial of the case, that the necessary initial investment of the Eagle Gas Company was estimated at from $13,000’ to $15,000. It is quite clear that the payment of $15,000 to John Stephens as compensation - for the sale of 200 shares of stock enabled him to negotiate and complete arrangements for the organization and operation of the Eagle Gas Company.
We do not think the appearance of John Stephens and his execution of the contract of November 12, 1954, would have served to’bind him-under the terms of the restrictive covenant which was enforced against his father if John 'Stephens had thereafter acted purely and simply on his own and in a capacity that was completely 'distinct, separate and apart from any association with his father.
We quite appreciate, understand and commend the spirit of paternal regard, affection and interest- which Albert Stephens contends exclusively motivated his actions in connection with the business undertaking of his son. However, in the instant case, it is utterly impossible to draw a clearly defined line of demarcation between the actions of these two parties in their father and son relationship and their. actions as two closely identified inr dividuals engaged in the confection of a plan which violated the explicit terms of a contract obligation assumed by one. Almost paradoxically the very meticulous and entirely circumspect efforts of Albert Stephens, in some instances, to appear disassociated from his son’s enterprise, argue most strongly against the logic of such a conclusion. The normal and understandable conduct of a father in the interest of his son’s welfare would not have required such a public washing of hands. And, as is the case with one who deliberately at-témpts to play an assumed role, there is convincing evidence of the occasions when the actor lapsed in his portrayal. The unnecessarily dramatic incident in which Albert L. Stephens refused to pay for labor performed for the benefit of Eagle Gas Company: but directed a Negro laborer to make the payment is one of those strange and completely unconvincing, acts which justify, rather than detract from, the sound■ness of a conclusion that the incident was •a part of the consistent development of a well-laid plan.
The record is somewhat confused by what we regard as a number of irrelevant and unimportant details. The use by. a son *498 of 'the father’s ' safe’ deposit- box, the ^father’s mailing. address, .the payment of funds by a father to his son- for application to the latter’s school expenses, despite the fact that he was engaged in what he represents as a. profitable husiness, are quite readily perceived to be ordinary -and easily understood details of an affectionate relationship. Did the record stop with such unpersuasive proofs we would find no difficulty in exonerating both father and son of activities which were .designed to violate the restrictive obligation which is the basis of this action. But, unfortunately for this contention of defendants, the record goes far beyond such unimportant and immaterial disclosures. It would be difficult to conceive of a more clearly defined plan for the financial embarrassment of plaintiffs than the one which has been quite conclusively established in the instant case. The picture is clear and no part is missing. Quite simply the facts are that defendant, Albert L. Stephens, became somewhat violently incensed by what he regarded as a financial loss, and, perhaps, more important, a loss of prestige, 'in connection with his sale of stock to Frank J. Roberson. Stephens publicly proclaimed his animosity toward Roberson and his intention of seeking revenge; he protested that he had been badly treated and had been beaten out of $70,000 (at this point- we reiterate our finding that there is nothing in the record which supports any such conclusion) ; he informed a number, of individuals of the proposed organization of a competitive enterprise which would reduce the price of gas by three cents immediately upon beginning operations; he declared he was out to break Frank Roberson; admittedly he solicited the business of his friends, and it matters not that this solicitation was designed for the benefit of his son;' he, with his son, consulted an''attorney for the purpose of procuring legal advice as to the' right of his son to enter business in competition 'with the corporations to whom he was bound; he, separately or in company with his son, participated in. numerous preliminary .' negotiations designed - to ■ effect .the organization of the enterprise later named and known as Eagle Gas Company; he paid to his son as consideration for the sale o.f stock an amount estimated as being the outside figure needed for the initial investment .'in the Eagle Gas Company.
The picture with respect to the effect of the actions of the son, John S. Stephens, is equally clear and equally as damaging to the defendant’s contentions. It is shown that John S. 'Stephens had been in the employ of the S. & R. Gas Company for a period of sortie two years. So far as it can be determined, the son, after his father’s sale of stock, suddenly conceives a plan to organize and operate a liquefied petroleum gas products business at some time after the father has completed a transaction with which he evidences angry dissatisfaction. The son, unquestionably influenced by the feeling of his father, accompanies his father to the office of an attorney-at-law . for the purpose of being counseled and advised as to his right to enter into a competitive business. The son, accompanied by the father, visits an industrial manufacturing company in ■Shreveport to discuss equipment. The son, after the father has made inquiry and has ascertained the availability of a site, negotiates for a location for his equipment. The son goes to Baton Rouge and enters school. Approximately one month later the son’s business enterprise begins operations from its domicile in Coushatta, Louisiana; the son fixed the price of his gas products at three cents below the prevailing market price. In connection with this last observation it is appropriate to comment on ■ the fact that no explanation is offered as to the fixing of the price at this exact -reduction. The son maintains he can and does make a pi-ofit at this figure, but it is established that the 'figure was first mentioned, so far as is evidenced by the record, by the father upon the basis of his declaration that the plaintiffs could not operate profitably on the basis of such a reduction. This is *499 the only reason which satisfactorily explains' the three-cent reduction.
We are impressed with the testimony of Albert L. Stephens. to, the effect that he never accepts nor transmits orders; he has nothing whatsoever to do with any of the business affairs df the Eagle Gas'Company, 'and he maintains a' hands-off policy. We say we are impressed, but not favorably.. These things ■ are but. minutiae in which the participation of the father could reasonably be understood and condoned. But while pointedly and strenuously abstaining from any activity in connection with these details, it. is established that the father inspired and provided for the organization and operation of a competitive enterprise on the basis of a price structure which would insure the financial embarrassment of the party against whom he had become so. incensed.
Under the facts which we have set forth, we are firmly convinced that the defendant, John S. Stephens, h.as acted as the alter ego of his father; that the formation and operation of the Eagle Gas Company resulted from the confection of a plan between the defendants, Albert L. and John S. Stephens; that such plan was carefully. designed to the end that it might appear and be accepted as an independent operation by the defendant, John S. Stephens; that Albert L. Stephens used the person and the individual identity of his own. son, John ,S. Stephens, with the I latter’s full knowledge, consent, acquiescence and assistance, as an agency intended to cause the financial embarrassment, and possibly the bankruptcy, of the plaintiffs to whom Albert L. Stephens-was bound by a covenant against competitive activity.
As to the law which is applicable under the facts of this case, -there can be little dispute as to the general principles.' The right'of a vendee of a business and its good wili as against a vendor, particularly when the contract of sale includes an obligation to refrain from competition, is beyond question. 24 Amer. Juris., verbo Good Will, Section 26, page 819; 38 C.J.S., verbo Good Will, § 16 c, page 963.
Nor is there any doubt as to the; proposition that injunction is the proper remedy. The universally accepted rule is succinctly stated in 28 Amer.Juris., verbo “Injunctions”, Section 102, page 296, as follows:
“It may.be stated as a settled rule that where, upon the sale or transfer of a business or industry or upon other occasion, an agreement is entered into restricting the right of one of the parties to engage in a similar business or industry, such agreement, if valid within the rules governing contracts in restraint of trade, will be enforced in equity by enjoining its breach, the relief being granted' because of the .lack of an adequate legal remedy. The mere breach of such restrictive covenant strongly points to irreparable injury in that the old business built up by the name will lose by having its customers drawn to a similar new enterprise.” Citing Eugene Dietzgen Co. v. Kokosky, 113 La. 449, 37 So. 24, 66 L.R.A. 503.
Counsel for defendant urges three general principles of law, with all oL which we are in complete agreement.
First: contracts in restraint of trade should be strictly construed; Railway Audit & Inspection Co., Inc., v. Pendleton, 175 La. 4, 142 So. 781; Simmons v. Johnson, La.App., 11 So.2d 710.
Second: contracts in restraint of trade should not be enforced unless supported by serious consideration, and,
Third: where there is a dispute over the provisions as to the meaning of contract stipulations the instrument must be inter *500 preted against the party by' whom ,or for whom it was prepared.
 Though, as stated, we completely accept all of these general principles, we do. not think the latter two are applicable in the instant case, in view of the fact that there is no possible ground for contention as to the adequacy of the consideration, nor is there any ambiguity or lack of clarity in the stipulations of the contract
We think it is patent, without need for further elaboration, that plaintiffs are clearly entitled to relief against the defendant, Albert L. Stephens. As a practical proposition, however, it must be considered that the granting of relief against this defendant alone would be a futile and useless gesture. Unless plaintiffs are entitled to relief against the defendant, John S. Stephens, and the Eagle Gas Company, under which trade name he operates, they have no effective protection.
Under the facts which we have above stated, we think the conclusion is inescapable that John S. Stephens was acting in concert with his father; that he was a party interposed, the alter ego, who acted in concert with his father for the accomplishment of a common purpose. Under these circumstances, certainly, plaintiffs aré entitled to relief against John S. Stephens, for he is the agency through and by which his co-d,efendant, Albert L. Stephens, has been enabled to pursue his announced intention of causing financial damage to plaintiffs. " ■
.The rule is stated in 43 C.J.S., verbo Injunctions, § 84d (2) page 577, as follows:
“A contract not to engage in a certain ■ business may be breached' by the seller engaging in the business in the name of another.”
Of'course; it may be argued in the instant case that the business of the Eagle Gas Company is being conducted by and for the sole benefit of John S. Stephens. While this may be true as to the accruing financial advantages, if any, it is not true as to the design, plan, and purpose of the business. We think there'is -adequate authority in our own jurisprudence to justify relief1 against John S. Stephens.
Article 2324 of the LSA-Civil Code provides that one who assists another in the commission of an unlawful act is answerable, in- solido, for damages. Although we are not here concerned with a question of damages, it logically follows, from this article, that such a party is subject to restraint against the continuance of his actions by means of the application of the equitable remedy of injunction.
In Webb v. Drake, 52 La.Ann. 290, 26 So. 791, the court held that a party who is aware of the feelings and actions of another, who joins in a combination or common purpose for the execution of an act designed to cause harm or damage, is solidarity liable. We think it appropriate to point out that the cited case involved the commission of acts designed to bring about financial loss to the plaintiff and were inspired, in the words of the court, by “feelings of personal resentment” against the plaintiff, which identical facts have been established in the instant case.
On the same general proposition, and to -the same effect, is the holding of the court in Rush v. Town of Farmerville, 156 La. 857, 101 So. 243, 247, in which the court stated:
“* * * the act done by one -in furtherance of the unlawful design is, in law, the act .of all. State v, Griffin, 48 La.Ann. 1409, 20 So. 905. - When a tort is perpetrated through the instrumentality of a combination * * *, the party wronged and- injured may look beyond the actual participants in committing the injury, and join with them, as defendants, all who co-operated in, advised, or assisted in the accomplishment of the common design, *501 for cotrespassers are bound in solido. Kernan v. Humble, 51 La.Ann. 389, 25 So. 431.”
We think the only distinction to be observed is that the court in the cited cases was dealing with wrongful acts in the nature of torts, while here we are concerned with wrongful acts flowing from a gross breach of contractual provisions. We perceive no reason why, under' the circumstances, the principles appropriate to one nature of action should not be applied to the other.
We conclude' that plaintiffs are entitled to the relief sought against both defendants, and, accordingly, the judgment appealed from is annulled, avoided, set aside and reversed and there is now judgment in' favor of plaintiffs, Frank J. Roberson, S. & R. 'Gas Company, Inc., and Canipti Butane, Inc.', and against the defendants,'Albert L. Stephens and John S. Stephens, jointly and in sólido, decreeing and directing the issuance of a permanent injunction 'against the said defendants, and each of them, enjoining, restraining, and prohibiting them, and each of them, from selling or offering for sale' at retail, as individuals or under the trade name of Eagle Gas Company, or otherwise, any and all liquefied petroleum gas products, particularly those products commonly known as butane and propane, in the landed area and territory which was served by the S. & R. Ga.s Company, 'Inc. and the Campti Butane, Inc., on1 November 12, 1954.
It is further ordered, adjudged and decreed that the right of plaintiffs to sue the defendants for damages suffered during the period in which the said defendants have been in violation of the contract of November 12, 1954, be, and it is, specifically reserved.
There is'further,-judgment in favor of plaintiffs and against the defendants for all costs of this suit in both courts.